## POLLOCK v. PEGUES.

ESTOPPEL—STATUTE OF FRAUDS—EVIDENCE.—If a party in possession of land under a parol agreement to purchase, a small part of purchase money having been paid, authorize the agent of vendor to sell the land to another agreeing to arbitrate his damages, if parties could not agree, and such agent communicate the agreement to the purchaser before contract of sale, which agreement induced the purchase, such purchaser may testify as to the parol agreement between the parties communicated to him by agent of vendor, and the holder of the equitable title is estopped from setting up any claim to the land as against such purchaser.

Before ALDRICH, J., Chesterfield, January, 1905. Affirmed.

Action by Carrie E. Pollock, W. P. Pollock, M. H. Stacey and L. E. Stacey against James W. Pegues. The cause was referred to R. T. Caston, who made the following report:

"It appears that the plaintiff, W. P. Pollock, acting as agent and attorney in fact for the plaintiff, Carrie E. Pollock, who is his sister, and by whom he was given such authority, had in his charge 400 acres of land, fully described in complaint, which was owned by her.

"In the early part of year 1902 he made for her a contract

and agreement with the defendant, James W. Pegues, the terms of which were, that Pegues was to rent the land at a stipulated rent and to purchase thirty-five acres of it at $8 per acre—the thirty-five acres being described in the testimony by boundaries. Under such agreement Pegues went into possession of entire tract, under contract to purchase the thirty-five acres, and to pay rent upon remainder, the uplands at a stpulated amount and the low grounds at one-fourth the crops raised.

"According to the testimony of Mr. Pollock, the rent for the uplands was agreed upon as $150 per annum, and according to the testimony of Mr. Pegues as two bales of cotton, each weighing 500 pounds.

"The defendant was given his own time in which to pay for the thirty-five acres, and made only one payment of $20 on the 14th day of February, 1902, for which he was given receipt in evidence, marked exhibit 'D.'

"At the close of the year 1902 a settlement of rent was made, leaving the defendant indebted upon this account in sum of $12. This, the defendant claims, was paid subsequently by him, by hauling plaintiff's share of the low land crop to Cheraw; plaintiff denies this, although admitting that same crop was so hauled, but did not agree to pay for hauling, nor was hauling worth so much. For year 1903, defendant paid $100 rent, which, according to defendant's contention, was full amount due, but which, according to the testimony of plaintiff, left $50 still due.

"From the testimony of all the witnesses in the case it appears to me that $150 was a reasonable rent for the place, exclusive of the thirty-five acres and the low grounds. The determination of the actual terms of renting is not so important, however, under the view taken by me.

"Near the close of the year 1903 the plaintiff, W. P. Pollock, received an offer of about $8 per acre for the entire tract, which he testifies had been on the market for some time and which he had up to this time failed to get taken at a fair price. As the would-be purchaser refused to trade

without getting the thirty-five acres, bargained to James W. Pegues, Mr. Pollock on more than one occasion saw Mr. Pegues and endeavored to get him to release his claim thereon, which Mr. Pegues was unwilling to do. Thereafter, on the first Monday in January, 1904, they met at Chesterfield and W. P. Pollock made James W. Pegues several offers, to induce him to release, offering him compensation for such damages as he might sustain thereby. Mr. Pollock testifies that Mr. Pegues did so agree, and that acting upon such agreement, he came to Cheraw that evening and stated to Mr. M. H. Stacy that release had been made and that there and then Mr. Stacy bought the entire tract, paid the purchase money and took title, relying upon the release of Mr. Pegues. Mr. M. H. Stacy soon thereafter conveyed to L. E. Stacy, the plaintiff, for whom he was acting in making original purchase.

"Mr. Pegues positively denies making such agreement. It is difficult to reconcile the testimony of these two witnesses, both of whom, I am satisfied, are honest in their statements. It becomes necessary, therefore, to take the statements of both of them and compare them with the surrounding circumstances.

"Mr. Pollock testifies that he proposed to Mr. Pegues to go ahead that evening and sell to Stacy the entire place, 'you (J. W. Pegues) come down and see me, and if you and I cannot agree on what, if anything, is right for me to pay you, then you appoint a man, I will appoint one and these two appoint a third, and whatever any two of these say, I will pay you.' * * * 'He said he would do it.' Mr. Pegues says that such a mode of settlement was proposed of the valuation of the house on the thirty-five acres, not included in first trade, but which Mr. Pollock had agreed to sell him at a reasonable price. He says he did consent to such settlement of the valuation of house, but not to a release of his claim upon the thirty-five acres of land. He also says, 'I told him I would not do it, and he said he did not think I was treating him right * * * He then told me that he would

4—72

sell the land any way and I could sue him. * * * He asked
me, then, what I would do, if he did it; I told him I would
have nothing more to say about it myself.    I meant I would
get some one to look after it for me.'

"There is other testimony upon this subject. The next
morning Mr. Pegues comes to Mr. Pollock's office and
asked him what he had done about the land, and was told
it was sold and deed delivered.    He then says, 'I then said
nothing for some time, and then told him, of course, I had
no more to say.'    He did, however, in a conversation offer
to take $1,000 in settlement.

"It appears that Mr. Pollock was determined to close this
matter with Mr. Pegues at conversation on Monday, as the
purchaser was to meet him in Cheraw Monday evening, and
the sale depended upon his acting promptly.    Mr. Pegues
was told of this.

"Mr. Pollock certainly understood Mr. Pegues to consent
to release, or else he acted with almost insane recklessness
in selling to Stacy, Monday evening.    Stacy was so in-
formed, and acted upon such information.    Was Pollock
justified in his understanding?

"Mr. Pegues says the arbitration, which was agreed to,
related to the value of the house; Mr. Pollock says this was
not mentioned.    Certainly the object in view was the release,
not the valuation, of the house.    There was no occasion for
Mr. Pollock to submit the valuation of the house to arbitra-
tion, as it was for Mr. Pegues to buy or refuse to buy, at
price offered by Mr. Pollock, who had the authority to sell.
It is not customary for contemplated buyers and sellers to
leave the valuation of the property in view to arbitration.

"Mr. Pegues testified that when Mr. Pollock told him he
was going to sell anyway, he replied, 'I told him I would
have nothing more to say about it myself,' and further states
that he meant that he would get some one else to look after
it for him, but he did not so tell Mr. Pollock.

"At best, Mr. Pegues did not as a prudent man make his
refusal to release clear and explicit.    I, therefore, find that

Mr. Pegues left Mr. Pollock under the impression that he had consented to release, and that under the circumstances Mr. Pollock had a right to so understand him. It was the fault of Mr. Pegues in not making his refusal clear and explicit, and he is, therefore, responsible for the consequences which followed.

"This, however, would not estop Mr. Pegues from standing upon his contract to purchase, had the rights of others not intervened. Mr. Stacy, the plaintiff, was thereby induced to part with his money and alter his position, as he would not otherwise have done. 'It is a well established principle, that when the true owner of property holds out another or allows him to appear as the owner of or as having full power of disposition over the property, and innocent parties are thus lead into dealing with such apparent owner, they will be protected.' Big. on Estoppel, 434; *Dunlop* v. *Gooding & Elliott,* 22 S. C., 550, and other S. C. cases, and also vol. 11 of En. of Law, 2d ed., pp. 422 and 429.

"I, therefore, find that Mr. Pegues is now estopped from denying the title of the plaintiff, L. E. Stacy, to the thirty-five acres of land.

"The value of the house upon the land, in view of my other findings, becomes of little importance. I will state, however, that from its location and condition, as testified to, it appears to be worth $100.

"There is no doubt the thirty-five acres in controversy is now worth more than when it was bargained to Mr. Pegues, both from improvements made and the rapid advance in real estate, which this section has recently experienced. It also appears that it is worth more per acre, naturally, than the remainder of tract.

"The witnesses value it at from $10 to $30 per acre. Most of the witnesses place its value at $20, and including the house thereon, I find this to be its present value.

"As all matters arising in the pleadings are before me, the damages sustained by Mr. Pegues by reason of his re-

lease of his contract to purchase, should be determined and adjusted in this cause.

"He is certainly damaged to the amount of the present value of the thirty-five acres (exclusive of the house, of course), less the balance of purchase money he was to pay, with interest thereon and such rents as he may still owe, up to January, 1904. (The rent for current year does not come into issue, as this matter can be adjusted between the parties at the proper time.)

"Without going into an exact calculation of such damages, I assess same at the sum of $250, less the costs of this case, which should be paid by the defendant.

"Upon the payment of such sum by the plaintiff, Carrie E. Pollock or W. P. Pollock, her agent, less the costs of this case, to the defendant, James W. Pegues, the title of the plaintiff, L. E. Stacy, in and to the said thirty-five acres, contracted to be sold to the said James W. Pegues, should be confirmed, and the agreement heretofore made with James W. Pegues to sell said thirty-five acres to him be abrogated."

The plaintiffs excepted to this report, as follows:

"First. The referee erred in not finding clearly, expressly and distinctly that the defendant, James W. Pegues, agreed and consented that W. P. Pollock, one of the plaintiffs, should sell the entire premises described in the complaint, to L. E. Stacy, leaving the adjustment of the differences between him and Pollock to be settled by arbitration if they could not agree, and that that fact and agreement was communicated to said Stacy, and that Stacy acted on it.

"Second. The referee erred in not finding clearly, expressly and distinctly that Stacy refused to buy the premises unless Pegues would release his claim to the thirty-five acres theretofore bargained to him; that that fact was communicated to Pegues; that Pegues thereupon agreed to release his claim to same, and consent for the entire tract to be sold to Stacy, and that, acting on Pegues' verbal release, Stacy

paid out his money and took title to the place, and W. P. Pollock, for himself and C. E. Pollock, acting on same, conveyed the land to Stacy.

"Third. The referee erred in not finding clearly, expressly and distinctly that Pegues knew that Stacy's trade with Pollock depended on his release of his claim to the thirty-five acres, and knowing that, he agreed to release same, thus induced Stacy to put out his money, and Pollock to make the conveyance.

"Fourth. The referee erred in not finding clearly, expressly and distinctly that Pegues was estopped from disputing Stacy's title, which he, by his express consent and agreement, had induced him to take, and pay out his money for, and from disputing Pollock's right to make such conveyance.

"Fifth. The referee erred in finding the value of the thirty-five acres to be $20 per acre, when the preponderance of the evidence showed it to be much less.

"Sixth. The referee erred in finding that Pegues was damaged by reason of the conveyance by Pollock to Stacy in the sum of $250; whereas, he should have found that, if he was damaged at all, it was in a much smaller amount."

The defendant excepted to this report, as follows:

"First. The referee erred in finding that it appeared from the testimony that $150 was a reasonable rent for the uplands described in the complaint; whereas, the question was not what was a reasonable rent, but what was the contract between the parties. And he erred in not holding that the contract between the parties was for two 500 pound bales of lint cotton.

"Second. He erred in finding that the arbitration proposed and discussed between the parties was regarding the release by Pegues of this purchase and did not refer to the value or price of the dwelling house on the land.

"Third. He erred in finding that the defendant did not make his refusal to release, or sell, clear and explicit; that he was in fault thereby and that he was responsible for the

consequences which followed, causing the sale of the land to the plaintiff, Stacy.

"Fourth. He erred in finding that Mr. Pegues left Mr. Pollock under the impression that he had consented to a release, and that under the circumstances Mr. Pollock had a right to so understand him.

"Fifth. The referee erred in holding that since the defendant did not make his refusal to release the land he had purchased clear and explicit to Mr. Pollock, he was legally bound by the act of Mr. Pollock, based upon his alleged understanding of what Mr. Pegues agreed to.

"Sixth. He erred in holding that the defendant is estopped from denying the title of the plaintiff, L. E. Stacy.

"Seventh. He erred in holding that the defendant was estopped from denying that he released his land because the rights of a third party, L. E. Stacy, had intervened, in that the defendant had held out another (Mr. Pollock), or had allowed him to appear as the owner of or as having full power of disposition over the property, it being error (1) In that there was no competent evidence that the plaintiff, L. E. Stacy, or his agent, had any information or communication from the defendant, Pegues, and he necessarily admitted the verbal statement of Mr. Pollock, that he communicated to Stacy that Pegues authorized him to sell. (2) In that there were no facts which could have misled Stacy, it not being contended that the defendant communicated any to him. (3) In that the facts relied on by Stacy, according to the referee, were contrary to the statute of frauds, and, therefore, Stacy could not be misled by them being charged with knowledge of the law relative thereto.

"Eighth. The referee erred in not holding that the alleged contract between Pegues and Pollock was *nudum pactum,* and could not be relied on.

"Ninth. In not holding land was worth $20 an acre without the house, and in holding that Pegues was damaged only $250, and that he should pay the costs of this suit.

"Tenth. He erred in admitting the testimony of Mr. M.

Stacy that Mr. Pollock told him that Mr. Pegues had agreed to the trade and consented to release his interest, when the same was mere hearsay and a declaration of Mr. Pollock in his own favor, and contrary to the statute of frauds.

"Eleventh. He erred in admitting the evidence of Mr. Pollock, that he told M. H. Stacy that Pegues had agreed to release him from his trade, for the reason that the same was hearsay, a declaration in witness' own favor and a violation of the statute of frauds.

"Twelfth. He erred in holding that the defendant was bound by a contract which Mr. Pollock thought was made, but which he did not find to become a contract by the meeting of the minds of the parties thereto.

"Thirteenth. He erred in holding that plaintiff, Stacy, could rely on an alleged contract, which he must have known was void under the statute of frauds and for want of consideration, on which to base an estoppel; when, if he knew all the facts which he states, he must have known, or be presumed to know, the contract was void.

"Fourteenth. He erred in holding that Mr. Stacy is in such position as to be caused loss by the failure to get the whole tract of land, when it is admitted that Mr. Stacy still owes $2,200 on the purchase money, out of which he can be made whole for any loss he may suffer by the inability of Mr. Pollock or his principal to make title to the whole.

"Fifteenth. He erred in not decreeing that plaintiffs execute to J. W. Pegues a good and lawful title to the land in question on payment of the amount due by him into Court."

The Circuit decree is as follows:

"This action was begun in February, 1904, and now comes before me upon the pleadings, testimony, report of R. T. Caston, Esq., exceptions thereto and argument of counsel. The pleadings and testimony, also the report of the referee, and exceptions thereto, must be read as a part of this decree.

"Miss Carrie E. Pollock, in 1901, owned about 400 acres of land, in Chesterfield County, bounded on the north by Pegues' land; east by Great Pee Dee River; south by Britt

lands, and on the west by public road leading from Cheraw, S. C., to Wadesboro, N. C. Late in 1901, W. P. Pollock, Esq., as agent and attorney for Miss Carrie E. Pollock, rented this land for an indefinite time to James W. Pegues, the defendant, for $150 per annum for uplands and one-fourth of all crops made on the lowlands.

"About the same time, W. P. Pollock, an agent and attorney for his sister, Miss Carrie E. Pollock, agreed, orally, with the defendant, to sell to him thirty-five acres of said land, at $8, with interest, per acre, and if this land, as laid off, embraced buildings on the place, defendant was to pay for them whatever the said W. P. Pollock charged, provided his charges were reasonable. Defendant was let into possession of the premises. Defendant paid $20 on his purchase of the thirty-five acres of land, on February 14th, 1902. Near the close of the year 1903, W. P. Pollock, Esq., received an offer of about $8 per acre for the entire tract; but the purchaser would not buy unless he could get the thirty-five acres sold the defendant. Mr. Pollock saw the defendant on several occasions, and, finally, he consented for Mr. Pollock to sell to Mr. Stacy. The referee found, substantially in favor of the plaintiffs. Both sides have appealed.

"The first, second, third and fourth exceptions of the plaintiffs are sustained, and must be read as a part of this decree.

"The plaintiffs' fifth and sixth exceptions are not sustained and are overruled, except as hereinafter they may be modified in this decree and judgment.

"The defendant's first exception, if well taken, should be sustained. I think that the referee meant to say the contract for rent, to be paid by defendant to Miss Pollock, was $150 for the uplands. Such a conclusion is sustained by the evidence, and I so find.

"Defendant's second (2) exception is overruled.

"The defendant's third (3) exception is overruled. The referee, in passing upon issues between gentlemen, evidently

tried to use as mild and gentle language as he could. No judicial officer is unnecessarily harsh. As I read the report, the referee meant to decide in favor of the plaintiffs; that is my conclusion, and I so hold.

"The defendant's fourth (4), fifth (5) and sixth (6) exceptions are overruled.

"The defendant's seventh (7) execption is overruled. That is the important exception in the case. The referee has discussed the statute of frauds, estoppel, and the law generally. I can add very little to what he has said, and only cite authorities. The defendant was the uncle of Miss Pollock, who was anxious to sell this large tract of land. She had, by her agent, let the defendant have thirty-five acres, at a small price and on an indefinite credit. He had paid but $20 on the purchase money. A purchaser, Mr. Stacy, presents himself, and offers to buy all of the land at a good price; he knows of the agreement with defendant, or has heard of it, and will not buy any of the land unless he can get it all. Defendant hesitates, but, finally, consents for Mr. Pollock to sell all of the land, after arranging how he can be compensated for his losses, if any. Mr. Stacy is told this, and he concludes his trade and paid a large cash payment on the purchase money. This estops defendant from now refusing to acknowledge what he said to Mr. Pollock, what was told to Mr. Stacy, and upon which he acted, and paid out his money.

"The eighth (8) exception is overruled. Defendant's ninth (9) exception is overruled.

"Defendant's exceptions, Nos. ten (10), eleven (11), twelve (12), thirteen (13), fourteen (14) and fifteen (15) are overruled. These exceptions are intended to reopen the entire case, and I cannot add much to what the referee has said, and I do not think that it is necessary for me to restate and discuss the entire case in its details.

As to the defendant's damages. The referee finds that the house was worth $100, but he considered the house and

the thirty-five acres sold to defendant together, and values them at $20 per acre, or $700.

"Defendant owed the plaintiff $280 for the land, and $100 for the house, less $20 paid, making a total of $360, principal, and interest thereon to January 1st, 1904, and the rent due by defendant, and we have the amount defendant is due the plaintiff.

"The thirty-five acres sold to defendant, including the house, was worth, as found by the master, $700. He reports that the plaintiff should pay the defendant, as damages, $250, less the costs of this action. That is about the actual damage ,or loss, the defendant has sustained, and I concur in that finding."

From this decree, defendant appeals.

*Messrs. Stevenson & Matheson,* for appellant, cite: *The agreement set up by plaintiff is void* (*a*) *for want of consideration:* 14 S. C., 334; 61 S. C., 546; 11 Rich., 135; Chitty on Con., 9 ed., 35. (*b*) *Void under statute of frauds:* 31 S. C., 75; 2 Rich. Eq., 177; 14 S. C., 334; 1 Rich. Eq., 91; Harp. Eq., 158; (*c*) *Statute cannot be avoided by applying doctrine of estoppel:* 4 Wall., 513. *There was no estoppel:* Felter on Eq., 45; 2 Pom. Eq. Jur., secs. 804, 808; 27 S. C., 1; 42 S. C., 351; 29 S. C., 436; 30 S. C., 100; 31 S. C., 442; 34 S. C., 186; 35 S. C., 93; Big. on Est., 555; 108 Mass., 245.

*Mr. Edward McIver,* contra, cites: *Defendant is estopped from repudiating his agreement:* 22 S. C., 548; 67 S. C., 432; 30 S. C., 612; 34 S. C., 464; 31 S. C., 153; 48 S. C., 267; 56 S. C., 476.

June 30, 1905. The opinion of the Court was delivered by

MR. CHIEF JUSTICE POPE. This is an appeal from a decree of his Honor, Judge James Aldrich. In order to

understand the issues here involved, the pleadings will be reproduced, and are as follows:

"The complaint of the plaintiffs shows:

"1. That in the year A. D. 1901, the plaintiff, Carrie E. Pollock, was lawfully seized and possessed of all that certain piece, parcel or tract of land, in Chesterfield County, S. C., containing 400 acres, more or less, bounded * * * the said land having been sold under foreclosure or mortgage, held by the said Carrie E. Pollock, and bid off by the plaintiff, W. P. Pollock, as attorney (but no deed made), and the said Carrie E. Pollock being in possession thereof.

"2d. That in the fall of the said year, 1901, the said W. P. Pollock, as agent and attorney for the said Carrie E. Pollock, contracted orally with the defendant to lease or rent unto him the said plantation, at a yearly rental of $150 per annum and one-fourth of all crops made on the low grounds, the said lease being for an indefinite term of years; and at the same time, the said W. P. Pollock, as agent and attorney as aforesaid, agreed orally with the said James W. Pegues to sell unto him twenty-five acres of land in the southwest corner thereof, bounded by the Britt lands, the said public road and the plantation road leading through said plantation: *Provided,* That the same should not take in any buildings on said place; and later agreed, orally, with said defendant to sell unto him thirty-five instead of twenty-five acres, at $8 per acre, with interest; and in addition, if said thirty-five acres of land as laid off between the boundaries above given and a line parallel with said public road embraced the buildings on the place, the said James W. Pegues was to pay whatever the said W. P. Pollock charged for the said buildings, the said W. P. Pollock simply agreeing to charge a reasonable amount for such buildings, with interest.

"3d. That in pursuance of all the foregoing, the said James W. Pegues went into the possession of all the said plantation, and for the year A. D. 1902 he paid only about $88 on the rent—the said W. P. Pollock having consented

to reduce the rent for said year to $100 on account of the poor crop made, and there is a balance due the plaintiff, Carrie E. Pollock, of about $12 on said rent for said year. That some time during the winter 1902-1903, or the spring of 1903, the said James W. Pegues paid unto the plaintiff, W. P. Pollock, as agent and attorney, the sum of $25, and requested that it be credited on the purchase of said thirty-five acres of land, which said amount is all the said defendant has ever paid on account of the purchase of said land, and for the year A. D. 1904, the said James W. Pegues only paid about $99.50 on the rent for said place for said year of $150, thereby leaving a balance due thereon of about $50.50.

"4th. That in the late fall of 1903, the plaintiff, W. P. Pollock, as attorney and agent as aforesaid, went to the said James W. Pegues and proposed to him, that in as much as he had an opportunity of selling the whole plantation, and the said defendant had not paid all rent due, and had paid practically nothing on the purchase price of said thirty-five acres of land, that he would like the said defendant to agree to give up all claim to the land and consent for said W. P. Pollock to convey same to another, and proposed if he would do so that he would cancel all indebtedness for rent and give the said Pegues the free use of as much of the land as he cared to cultivate for the year 1904, and finally to give him $50 in cash in addition. That the said defendant, after more than one conference with said W. P. Pollock, declined said proposition. Thereupon said Pollock demanded of said Pegues payment for said thirty-five acres of land at $8 per acre (to wit: $280), and payment for the buildings thereon, which are embraced in said thirty-five acres, the sum of $150, which is very reasonable, if not very low price for same, and interest thereon, less the $25 paid, and the balance due on rent, and offered to at once make deed to said defendant to said land; but the said defendant positively refused and failed to pay same, and said he would not and could not pay more than $280—

that is, $8 per acre for the thirty-five acres. The said W. P. Pollock then proposed that he would go ahead and convey said place, and that said Pegues might sue this plaintiff, and whatever amount he might get judgment for would be promptly paid, which proposition was declined. Thereupon the said W. P. Pollock proposed that he would convey said lands to another, and the said J. W. Pegues should yield possession thereof, and if he and said Pegues could not agree on an amicable settlement, that they would each appoint a disinterested person, and those two could appoint a third person, who should fix the amount, if anything, which should be paid to said Pegues, and the said Pegues agreed to the said proposition and agreed for said Pollock to convey said lands.

"5th. The said W. P. Pollock, as agent and attorney for said Carrie E. Pollock, for the sake of convenience, had the clerk of Court to make title to him, and after the said agreement with the said Pegues, which he communicated to M. H. Stacy, he conveyed by warranty deed all of said tract of land to said M. H. Stacy, and the said M. H. Stacy by deed conveyed same to L. E. Stacy, who now holds the title thereto, but the possession was retained by W. P. Pollock, as agent and attorney as aforesaid, until the first of January, 1905.

"6th. That thereafter the said J. W. Pegues demanded of said W. P. Pollock the sum of $1,000, which was refused, and said W. P. Pollock proposed to leave the matter to three disinterested parties, as was the agreement, but the said Pegues refused to do so, notwithstanding that he had agreed that he would do so, and he now unlawfully withholds possession of said thirty-five acres and the buildings.

"7th. That the original agreement between the parties has been broken by the said defendant, and in addition thereto the same has been superceded by the subsequent agreement above set forth, but the claim of the defendant is a cloud on the title.

"Wherefore, plaintiffs pray judgment that the original

agreement between parties be cancelled and set aside, and for such other and further relief as to the Court may seem meet and proper, and for costs."

"The defendant, answering the complaint herein, says:

"First, for a first defense:

"I. That he admits the allegations contained in the first paragraph of said complaint.

"II. That he denies the allegations of the second paragraph of the complaint as to the rental of the plantation being for $150 per annum, and alleges that the rent to be paid for that part of the plantation not bought by this defendant was to be two bales of cotton, 500 pounds weight each, and one-fourth of all the crops made on the low grounds, except such crops as were planted in the low grounds by this defendant; this he was to have free of charge for looking after the other crops made on the low grounds for W. P. Pollock. And he alleges that the said Pollock received one-fourth of all such crops; and he denies, also, that he was to pay for the house what the said W. P. Pollock charged for the said building, and alleges, on the contrary, that he was to pay a reasonable charge for the buildings, if they were embraced in the lands bought, when they were marked out.

"III. He alleges that in so far as the allegations in the third paragraph are concerned, he denies that he only paid $88 on the rent, and denies that there is a balance due of $12; but he alleges, on the other hand, that he paid two bales of cotton, which, on account of shortage in the weight, left a balance of $12, which W. P. Pollock agreed to allow him for hauling the rents received from the low grounds to Cheraw for him; and he denies, further, that he ever agreed to pay anything else as rent for the lands not purchased, either for the years 1903 or 1902, than two bales of cotton of 500 pounds weight, and he alleges that he has paid and discharged all sums due for rent for said lands. He denies, also, that the payment, which he made upon the land, was at the date or of the amount alleged in said paragraph.

"IV. He admits, in so far as the fourth paragraph of the complaint is concerned, that the plaintiff, W. P. Pollock, did endeavor to get. this defendant to surrender his rights, and alleges that he offered him so much of the land as he cared to cultivate for the year 1904, and $100 in cash, but that said proposition was declined, and that he offered to pay the amount of the purchase money, to wit: $8 per acre, and offered further to pay what was reasonable for the buildings, but was not willing to pay $150, which was more than double the value of the said building when defendant received it.  He denies further and most positively, that he ever agreed to consent to a sale by the plaintiff, or either of them, of this land to a third person and to hold possession thereof pursuant to such sale, or to leave the damage, which he should suffer thereby, to disinterested persons, or that he would sue the said W. P. Pollock for his damages; but, on the other hand, he positively declined to allow such sale, and they failed to agree to any such proposition.  He' further alleges that he has always been ready and willing to pay for the tract of land under the contract specified, and he is now ready and willing to do so and take his title according to said contract, and he is ready to pay for the building, which he has improved and added to and made habitable, at whatever it was reasonably worth when he bought it, and he is ready to bring the money into Court, if so ordered, and take his title according to the contract under which he has gone into possession of said property and has improved the same.

· "V. That defendant has not sufficient information on which to base a belief as to the fifth paragraph of the complaint and demands strict proof thereof.

"VI. That defendant admits that he asked $1,000 for his land, which he had purchased and gone into possession of and had improved under a contract, for a title out of which $1,000 he was and is ready and willing to settle any sums which he may be owing the ·plaintiffs, or either of them, but he denies that he had agreed that he would yield

possession, or that the said land might be sold, or that he withholds unlawfully the said possession of said tract.

"VII. He denies that the agreement had been broken by himself, but alleges that it has been broken by the plaintiff, W. P. Pollock, and he denies that it has been superceded by any subsequent agreement, or that any such agreement subsequent thereto has been entered into by him. And he alleges that he has gone into possession of the land so described under a valid contract to purchase, that he has improved the same in many particulars, and that he is ready and willing to carry out his contract and pay for the same according to the contract, and he desires that the title shall be made to him, and he alleges that all the plaintiffs herein had full notice of his rights before any of the transactions relating to the sale to other parties occurred.

"Second. For a second defense.

"1. The defendant alleges that the said contract, which the plaintiff sets up in paragraph IV. of the complaint (which contract this defendant denies), is a contract relative to an interest in lands, and no memorandum thereof has been made in writing, signed by this defendant or either party thereto, and, therefore, the same is void under the statute of frauds.

"Wherefore, this defendant demands that the plaintiffs, or which ever one of the plaintiffs has the legal title, be required to execute to him a good and indefeasible title in fee simple, that the amount that is due and owing by this defendant under the contract made for said lands, be ascertained and determined by this Court, and that he be permitted to bring same into Court and to receive the title agreed upon in the original contract, and for such other and further relief as to this Court seems meet and proper."

As may be recalled from reading the pleadings herein, the issue paramount to all others is that of the alleged estoppel of the defendant, J. W. Pegues, from asserting an equitable claim upon thirty-five acres of land now embraced in the deed of 412 1-2 acres conveyed to M. H. Stacy by

Miss Carrie E. Pollock, on the fourth of January, 1904. The alleged estoppel grows out of this state of facts, to wit: Carrie E. Pollock, in 1901, through her attorney, W. P. Pollock, made a parol sale of thirty-five acres, a part of her 412 1-2 acres, at $8 per acre, and it not being known whether the thirty-five acres so sold would embrace the dwelling house, it was agreed that if such dwelling house should afterwards be discovered to be located on the said thirty-five acres, that James W. Pegues would pay that sum which W. P. Pollock, as attorney for said Carrie E. Pollock, might reasonably require therefor.

Thereafter, on the 14th of February, 1902, J. W. Pegues paid the sum of $20, as part of the purchase money of said lot of land, and no other payment has ever been made by him.

Near the close of the year 1903, after repeated efforts to sell, W. P. Pollock, as attorney for Carrie E. Pollock, began a negotiation with M. H. Stacy, a citizen of the State of North Carolina, looking to the sale of Miss Pollock's land, Stacy offering $3,300 for the entire tract, including the thirty-five acres of land bargained to J. W. Pegues. The said M. H. Stacy positively refused to buy any part of Miss Pollock's land unless he could obtain the land bargained to J. W. Pegues. These facts were communicated by W. P. Pollock to the said J. W. Pegues, and inducements were offered by W. P. Pollock to the said J. W. Pegues, in order to induce him to relinquish his claim to said thirty-five acres of land. Interview after interview was held by Pollock with Pegues without accomplishing any result. Finally, M. H. Stacy agreed to meet W. P. Pollock in his office at Cheraw, on the evening of the fourth day of January, 1904, to hear what had been the result of his negotiations with Pegues, and if fortunate, to close the trade. These facts were fully communicated by W. P. Pollock to J. W. Pegues at an interview at Chesterfield Court House, on the afternoon of the fourth of January, 1904.

As a final outcome of those negotiations, it was agreed

5—72

by Pegues with Pollock that he should convey his thirty-five acres along with the other lands to M. H. Stacy, at the price of $8 per acre for the whole tract, and that J. W. Pegues would come to Cheraw on Tuesday, the fifth day of January, 1904, to see Pollock what amount of money should be paid the said Pegues for his surrender of his claim on the thirty-five acres of land which Pollock was to convey to M. H. Stacy. M. H. Stacy and Pollock met the evening of January the fourth, 1904, whereupon Stacy paid $1,100 in cash, and executed his bond and mortgage for $2,200 to W. P. Pollock, and Pollock thereupon conveyed the 412 1-2 acres to the said M. H. Stacy, and thereafter the said M. H. Stacy conveyed the entire tract to L. E. Stacy, as whose agent he had purchased the same. On the next morning, the said J. W. Pegues demanded $1,000 for his interest, which Pollock declined to pay, but offered to leave it to the award of the three arbitrators, as had been previously agreed upon by Pollock and Pegues, but this Pegues declined to do, retaining possession of the land; hence this action.

By agreement of the parties, an order was passed by Judge Watts, wherein all the issues of law and fact were referred to R. T. Caston, Esq., as special referee. A great deal of testimony was offered by both parties to the issues raised by the pleadings. The report of said special referee was made, wherein he found that Pegues was bound by the representations he had made to Pollock, and which Pollock had repeated to M. H. Stacy, and that he was thereby estopped from alleging any claim to the thirty-five acres of land, which said Pegues had bargained to purchase from said Carrie E. Pollock.

To this report both parties, plaintiffs and defendant, filed exceptions. The whole then came on to be heard by Judge Aldrich, who rendered his decree, January, 1905, wherein he sustained some of the exceptions of the plaintiffs, overruling two of the same, but overruling all of the exceptions of the defendant.

As recommended by the report of the special referee, Judge Aldrich adjudged as follows:

"1. That the plaintiff, Carrie E. Pollock, do pay to the defendant, James W. Pegues, the sum of $250, less the cost of this action, to be taxed by the clerk of this Court.

"2. That the clerk of the Court do tax the costs of this action, after legal notice of such taxation to the parties here, and that the plaintiff do pay such costs; and the remainder of the $250, found above as damages, to the defendant.

"3. That upon the payment of the aforesaid by the plaintiff, Carrie E. Pollock, or her attorney, to the defendant, the title of the plaintiff, L. E. Stacy, in and to the thirty-five acres, described in the pleadings herein, as having been contracted to be sold by Carrie E. Pollock, or her attorney, W. P. Pollock, to the defendant, James W. Pegues, be, and hereby is, affirmed; and the said James W. Pegues be, and hereby is, forever estopped from, in any manner, disturbing the title and possession of the said L. E. Stacy.

"4. This decree stops with the rent, or accounting for rents, on January 1st, 1904, and nothing after that date is included herein."

Let the report of this case contain a copy of the referee's report and the exceptions thereto and the Judge's decree.

The defendant alone appealed from the decree of Judge Aldrich, on nine grounds, which we will hereafter consider.

The first and second grounds of appeal are as follows:

"I. In that the Judge erred in holding competent and considering the testimony of M. H. Stacy, that W. P. Pollock told him he had arranged the matter of the surrender of the place with J. W. Pegues and told him the particulars of it, this being mere hearsay and incompetent and irrelevant.

"II. Because he held competent and considered the testimony of Mr. Pollock, that he had told said M. H. Stacy that the said matter was arranged, and also considered and held competent the details of said conversation, same being

hearsay, a declaration in his own favor by the witness in the absence of the defendant, and incompetent."

And the third, fourth, fifth, sixth, seventh, eighth and ninth are as follows:

"III. Because the Court erred in finding as a matter of fact that the defendant agreed to give up the land and arbitrate the damages.

"IV. Because the Court erred in holding that the defendant was bound by such agreement, if made, the same being with reference to an interest in land, and void under the statute of frauds.

"V. Because the Judge erred in holding that the defendant was estopped by reason of the fact that M. H. Stacy had knowledge of such an agreement, the same being error; (a) because defendant made no such communication to said Stacy; (b) because, if he had done so, Stacy is charged with knowledge of the law, that such an agreement must be in writing to bind the defendant, and his knowledge was such that he could not have been misled as to the legal effect of such an agreement, and there is no estoppel where the party invoking it is not misled.

"VI. Because it appears as an admitted fact that L. E. Stacy had traded for the land on Friday before the conversation invoked as an estoppel occurred on Monday; hence he could not have been misled by that conversation.

"VII. He erred in holding that by applying the doctrine of estoppel, the statute of frauds can be avoided in transactions relative to real estate.

"VIII. He erred in not holding that the plaintiff, Stacy, was fully protected, and could not invoke the doctrine of estoppel, for the reason that he still owed far more than the amount of land which was lost, and could get an abatement of price to protect him from loss.

"IX. He erred in not holding that the agreement alleged by W. P. Pollock and denied by J. W. Pegues, that Mr. Pegues agreed to allow Mr. Pollock to sell the land in dispute to L. E. Stacy, was void for want of consideration."

We first pass on the sixth exception.   We do not agree that the testimony establishes that L. E. Stacy had traded for the land on the Friday before the Monday, the fourth day of January, 1904.   On the contrary, the trade was not made until the latter date.   This ground of appeal is over-ruled.

It may not be amiss at this junction to ascertain what estoppel means.   In sixteen Cyc., at page 679, it is held: "In the broad sense of the term, 'estoppel' is a bar which precludes a person from denying the truth of a fact, which has in contemplation of law become settled by the facts and proceedings of judicial or legislative officers, or by the act of the party himself, either by conventional writing or by representations, expressed or implied, *in pais.*"   Or, as is said in Greenleaf's Evidence, chap IV.: "An estoppel arises where a man has done some act which the policy of the law will not permit him to gainsay or deny."

In eleventh A. and E. Ency., page 429, it is said, "Also, it seems to be well established, as a general rule, that if a man knowingly suffers another to purchase and expend money on land under an erroneous opinion of title, though he does it passively by looking on, without making known his claim, he shall not afterwards be permitted to exercise his legal right against that person.   This rule is especially applicable where the owner has encouraged the parties to deal with each other in such sale and purchase."   By the same author just quoted, at page 424, it is said: "To constitute an estoppel by misrepresentation or concealment of facts, certain prerequisite facts must be proved.   As fraud is not presumed, but, when charged, must be strictly proved, the authorities uniformly hold that the evidence, to establish the essential elements of an estoppel by conduct or misrepresentation, must be clear, precise and unequivocal.   And it has been held that this rule should be strictly applied where the estoppel is envoked against a claim to real estate.   The doctrine is opposed to the letter of the statute of frauds, and would greatly tend to the insecurity of titles, if they were

allowed to be affected by parol evidence of light and doubtful character. It is held that the facts necessary to work an estoppel must appear affirmatively."

To the same effect, Pom. Eq. Jur., 2d vol., sec. 803. Also, in sec. 807 of the same author, it is said: "The general rule is that if a person interested in an estate, knowingly misleads another in dealing with the estate, as if he were not interested, he will be postponed to the party misled, and compelled to make his representations specifically good. It applies to one who denies his own title or encumbrance, when enquired of by another who is about to purchase the land, or to loan money upon it as security; to one who knowingly suffers another to deal with the lands as though it were his own; to one who suffers another to expend money in improvements without giving notice of his own claim, and the like. This equity being merely an instance of fraud which is evidence of an intent to deceive." Continuing the same quotation, the author says: "It is opposed to the letter of the statute of frauds, and it would greatly tend to the insecurity of titles if they were allowed to be affected by parol evidence of light or doubtful character."

Our own decisions fully sustain this doctrine, as will be seen by *Chambers* v. *Bookman,* 67 S. C., 432, 46 S. E., 39; *Bethune* v. *McDonald,* 35 S. C., 88, 14 S. E., 674; *Gaston* v. *Brandenburg,* 42 S. C., 348, 20 S. E., 157; *Dunlap* v. *Gooding and Elliott,* 22 S. C., 548. The tenor of these decisions and quotations from eminent authors abundantly show that the seventh ground of appeal must be overruled.

Having determined the law relating to estoppel, we will now discuss the facts here involved, always remembering, however, that the Circuit Judge has decided adversely to the defendant in his construction of the testimony, and it will require the appellant to advance testimony sufficient to overcome this finding of the Circuit Judge.

In the first place, it may be observed that the admission of the testimony by parol, inasmuch as fraud may be said to be herein involved, was a necessity. It may not be amiss

to remind parties to this action that of all gross carelessness relating to titles of real estate the conduct of W. P. Pollock and James W. Pegues furnish an instance. In 1901, when the thirty-five acres were bargained by W. P. Pollock, no minute of this transaction was made. There was no plat of said lands made by a surveyor—indeed, the only evidence of a written character, was the receipt of $20 paid on the 14th of February, 1902, long after the trade itself was made. It was not known whether the dwelling house was on the thirty-five acres of land; the minds of these men never met as to what value should be placed on the dwelling house, and at this date that condition of things exists—one claiming it is worth $50, and the other at least $150. The same uncertainty existed in the minds of the parties as to what the rent should be. These matters are mentioned to show that parol testimony was absolutely necessary to fix the status of this thirty-five acres of land as between Mr. Pollock and Mr. Pegues. There being nothing in writing, all testimony was by parol, but now what shall we say? The rights of W. P. Pollock are not involved, because he has transferred the legal title to all these lands to M. H. Stacy, who has in turn deeded them to L. E. Stacy—both of whom are innocent parties.

The question now comes as to whether the witness, M. H. Stacy, may testify, giving a detailed statement of W. P. Pollock's representation of J. W. Pegues' authority to him to sell the thirty-five acres of land. James W. Pegues had an equity arising out of a parol agreement respecting the thirty-five acres of land. Stacy would not purchase any of the land unless he could obtain the thirty-five acres in the possession of J. W. Pegues. This fact was known to both Pegues and Pollock. Stacy knew that Pollock had gone to see Pegues on Monday just before he received his title. It is a part of the history of the transaction for Stacy to be able to tell what representations Pollock made to him as coming from J. W. Pegues.

W. P. Pollock insists that every word that he detailed to

Stacy was uttered by J. W. Pegues a few hours before he met Stacy. It is true, Pegues now denies that he uttered such words to Pollock on that day. We have given this matter a most careful consideration and must say that, as the result of that investigation by us, we have reached the deliberate conclusion that W. P. Pollock has told the exact truth in what he states, and that, on the contrary, J. W. Pegues is more than mistaken in what he states as to the agreement between himself and W. P. Pollock. It was no part of Pollock's mission to Chesterfield Court House on Monday, January 4th, 1904, to ascertain what J. W. Pegues should pay for the dwelling house on the thirty-five acres; he was seeking to protect the estate in land of his young sister, involving several thousand dollars. It was to see about the sale of his sister's lands that he sought this interview with J. W. Pegues. What W. P. Pollock has represented as coming from J. W. Pegues is sustained by the fact that on the train on his way from Chesterfield Court House to Cheraw, he told his friend, Mr. Matheson, all that he testifies that he told Stacy. And when he reached Cheraw that evening, he told M. H. Stacy the same state of facts, and he is further sustained by J. W. Pegues himself, who said in his testimony, "I had promised Mr. Pollock that I would see him that morning, which was Tuesday, the 5th day of January, 1904. In that interview, after a while, I said, Willie, what have you done about that land? He said, I have sold it and made the deeds. I didn't say anything for some time, and then I told him, of course, I. had nothing more to say. He asked me what I would take for the land and I told him $1,000."

From Mr. Pollock's testimony the following is extracted: "To show further that I cannot be mistaken as to its being exactly as I stated, when he came down the value of the house was not mentioned, but I asked him what he would be willing to take to close the matter up, that I had gone ahead and sold upon our understanding, and he said $1,000."

If James W. Pegues did not authorize William P. Pollock to make the representation to M. H. Stacy that he did, then there was a fraud perpetrated by him; but, on the contrary, if James W. Pegues did authorize W. P. Pollock to convey the thirty-five acres to M. H. Stacy, including his claim of the thirty-five acres, and denies it as he now does, then he is guilty of a fraud. We are satisfied that W. P. Pollock has been guilty of no fraud, but that James W. Pegues did make the agreement as charged by Pollock, and that Stacy did purchase upon the representation repeated as coming from James W. Pegues, that he would not have made the purchase except for his reliance upon the representation made by James W. Pegues, that Stacy thereby was misled to his prejudice by James W. Pegues, that the testimony of Stacy and of Pollock was necessary to uncloak this wrong; hence such testimony was admissible. We must, therefore, overrule the first and second exceptions.

From a careful examination of the testimony, we find that the defendant did agree to give up the land and arbitrate the damages. The third ground of appeal is, therefore, overruled.

We find that the Circuit Court did not err in holding that the defendant was bound by his agreement, although it was with reference to an interest in the land, and it was not void under the statute of frauds. We find that the agreement was clear and explicit, and would be a fraud upon the rights of Stacy if not upheld. The fourth ground of appeal is, therefore, not sustained.

As to the fifth ground of appeal, we cannot sustain the same on the grounds already advanced by us. It is, therefore, overruled.

We cannot hold that Stacy could be fully protected by reason of the fact that he still owes $2,200 on the land. He was fully entitled to every acre of the 412 1-2 acres. He refused to buy except as an entirety. This ground of appeal is unsustained.

Lastly, we cannot agree to the ninth ground of appeal,

for there was a full consideration, even as to James W. Pegues. This ground of appeal is overruled.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.

Mr. Justice Gary. The agreement entered into between J. W. Pegues and W. P. Pollock was not executory or conditional, in so far as it conferred upon W. P. Pollock the right to sell the land to M. H. Stacy, which could be exercised immediately after the agreement. The fact that the agreement was executory as to the amount of compensation to be paid J. W. Pegues did not prevent W. P. Pollock from conveying the land before the amount of compensation was ascertained. As the conduct of J. W. Pegues induced others to deal with the land, he was thereby estopped from setting up the plea that the agreement was void under the statute of frauds.

For these reasons, I concur in the result announced in the opinion of Mr. Chief Justice Pope.

Mr. Justice Woods. I concur in the conclusion that the defendant was estopped from claiming any interest in this land against the plaintiffs, M. H. Stacy and L. E. Stacy, by his agreement communicated to them under authority from him and upon which they acted in purchasing, that he would claim no interest in the land, and would look to W. P. Pollock, Esq., for compensation. *Moore* v. *Trimmier,* 32 S. C., 525; 11 S. E., 548; *Shuford* v. *Shingler,* 30 S. C., 612; 8 S. E., 799; *Williamson* v. *Jones,* 4 Am. & Eng. Dec. in Equity, 299, notes 24, 25 and 26.

Mr Justice Jones *concurs in the result.*